# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
5/26/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___vv___ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>ANDRE ADRIAN MCKENZIE and<br>JAFAR SADIQ EL-EMMARA,<br><br>Defendant. | Case No. 2:24-mj-03086-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of May 24, 2024, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1): | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Erwin M. Benedicto, DEA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 5/26/2024

City and state: Los Angeles, California

[Judge's signature]
Judge's signature

Hon. Margo A. Rocconi, U.S. Magistrate Judge
Printed name and title

AUSA: Kenneth R. Carbajal x3172

**AFFIDAVIT**

I, Erwin M. Benedicto, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Andre Adrian MCKENZIE ("MCKENZIE") and Jafar Sadiq EL-EMMARA ("EL-EMMARA") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search two digital devices (collectively the "SUBJECT DEVICES"), in the custody of the Alhambra Police Department, in Alhambra, California, as described more fully in Attachment A, namely:

    a.  an Apple iPhone in a red cell phone case seized from MCKENZIE on May 24, 2024 ("SUBJECT DEVICE 1"); and

    b.  a blue Apple iPhone 13 Pro seized from EL-EMMARA on May 24, 2024 ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and

1

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II. BACKGROUND OF AGENT

5. I am a Special Agent ("SA") of the United States Drug Enforcement Administration ("DEA") and am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered to conduct investigations of, and to make arrests for, the narcotics offenses enumerated in Title 18, United States Code, Section 2516.

6. Until May 25, 2018, I was assigned to DEA Enforcement Group 1 at the Honolulu District office in Honolulu, HI, and have been employed by the DEA since July 15, 2012. I am currently assigned to DEA High Intensity Drug Trafficking Area ("HIDTA") Group 46. Group 46 investigates major narcotics trafficking organizations operating from Mexico, China and India. I attended 18 weeks of training at the DEA Academy in Quantico, Virginia, where I received specialized training concerning the Controlled Substance Act contained in Title 21 of the United States Code and criminal conspiracy involving the smuggling and distribution of narcotics and dangerous drugs.

Prior to my employment with DEA, I was employed as an attorney in private practice in Los Angeles, California.

7. I have received specialized training from DEA in federal drug law enforcement. I have been involved in numerous drug-related arrests, numerous search warrants, and surveillances. I have debriefed numerous narcotics traffickers following their arrest. I have participated in drug trafficking investigations in which court-authorized wire interception was utilized. During this time, I have become knowledgeable with the enforcement of state and federal laws pertaining to narcotics and dangerous drugs. Based on this experience, I have become well versed in the methodology utilized in narcotics trafficking operations, the specific types of language used by narcotic traffickers, the unique trafficking patterns employed by narcotics organizations and their patterns of drug abuse.

### III. SUMMARY OF PROBABLE CAUSE

8. On May 24, 2024, officers of the Alhambra Police Department ("Alhambra PD") arrested MCKENZIE and EL-EMMARA for a violation of California Health and Safety Code § 11352: to sell, furnish, administer, give away or transport controlled substances.

9. On May 24, 2024, in the early afternoon, the owner of a single-family home located in Alhambra, California (the "Residence"), that is available to rent on the Airbnb website, called the Alhambra PD to report that numerous carboard boxes containing what appeared to be drugs were found in the Residence. Shortly afterward, when two uniformed Alhambra PD

3

officers arrived at the Residence, the officers observed approximately 25 boxes containing methamphetamine wrapped in plastic.  The owner of the Residence showed the officers video doorbell footage, dated May 22, 2024, which depicted two men carrying the boxes from a U-Haul van into the Residence.  After the officers had loaded all the boxes containing the methamphetamine into a police vehicle for transport to the Alhambra Police Station, the officers noticed a similar U-Haul van drive towards the Residence, conduct a three-point turn (police vehicles were parked outside the residence at the time the U-Haul arrived), and drive away from the Residence.  The occupants of the U-Haul looked like the men in the video.  A separate Alhambra Police vehicle followed the U-Haul van and conducted a traffic stop.  The two occupants of the U-Haul van were EL-EMARRA, who was the driver, and MCKENZIE, who was the front passenger.  Based on the video footage, MCKENZIE and EL-EMMARA were positively identified as the men moving the boxes from the U-Haul van into the Residence.

 10. During a Mirandized interview of El-EMMARA, he admitted his belief that the boxes contained an illegal drug. El-EMMARA also admitted that he and MCKENZIE both moved the boxes into the Residence.

## IV. STATEMENT OF PROBABLE CAUSE

 11. Based on my conversations with Alhambra PD personnel, other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

12. The Residence is a two-bedroom, one-bathroom, single-family home available for rent on the Airbnb website.[1] Through Airbnb, a person named Juan Cisneros Jaramillo booked the Residence from May 22, 2024, until May 24, 2024. Check-out from the Residence is at 11:00 a.m.

13. On May 24, 2024, at approximately 1:00 p.m., Alhambra PD Officer Rocio Garcia and Alhambra PD Corporal Eric Ybarra arrived at the Residence in response to a call from the owner of the Residence, who is also the Airbnb host. When the officers arrived, the owner, the person who cleans the rental, and one other individual were waiting for them at the Residence.

14. According to the owner, the person who booked the Residence (presumably Mr. Jaramillo) attempted to extend the Airbnb booking by one extra day, until May 25, 2024. The owner denied the request to extend because the Residence was already booked by new renters. The owner explained to officers that, earlier that morning, shortly after the 11:00 a.m. check-out time, the person who was cleaning the Residence found numerous unopened cardboard boxes in the Residence. According to the owner, the cleaner called the owner and asked for instructions. The owner told the cleaner that the boxes were abandoned and instructed the cleaner to open the boxes. The cleaner opened

---

[1] Airbnb is an online platform where people can list or rent properties for short-term use. Once a guest has found a suitable property, they can send the "host" an inquiry (unless Instant Book is enabled) with questions about the property or expressing an interest to rent the property. The host has 24 hours to accept or reject booking requests.

5

the boxes, and they appeared to contain drugs.  The owner contacted law enforcement.

15. Officer Garcia and Corporal Ybarra observed that the approximately twenty-five cardboard boxes were moved outside and placed in the front porch/yard area of the Residence.  Inside the cardboard boxes, Officer Garcia and Corporal Ybarra saw a clear crystalline substance that appeared, in their training and experience, to be methamphetamine wrapped in clear plastic.

16. There is a doorbell security camera located in the front of the Residence.  The owner showed Officer Garcia and Corporal Ybarra a video recording, dated May 22, 2024, which is the first day of the Jaramillo reservation.  At approximately 6:44 p.m. that day, the video showed a U-Haul van back into the driveway of the Residence.  The video then showed two men, later positively identified as MCKENZIE and EL-EMMARA, moving cardboard boxes from the U-Haul into the Residence.

17. Alhambra PD personnel loaded the boxes of methamphetamine into a police vehicle for transport to the Alhambra Police Station.  While still at the Residence and as they were finishing loading up the boxes, Corporal Ybarra observed a U-Haul van – which, according to Corporal Ybarra, looked similar to the U-Haul van in the doorbell footage - drive into the middle of the street in front of the Residence and stop.  The U-Haul van then conducted a three-point turn and drove away from the Residence.  Corporal Ybarra observed that the occupants of the U-Haul van looked similar to the men in the video.  Alhambra PD police vehicles and officers were visible in

the area of the Residence and Corporal Ybarra believes the occupants of the U-Haul likely were returning to the Residence attempting to retrieve the cardboard boxes, but left the area when they saw law enforcement outside the Residence.

18. Other members of Alhambra PD conducted a stop of the U-Haul van based on suspected drug trafficking. EL-EMMARA was the driver of the U-Haul and MCKENZIE was the front passenger. By comparing the occupants of the U-Haul to still frames of the individuals in the video, MCKENZIE and EL-EMMARA were identified as the two individuals transporting the cardboard boxes from the U-Haul to the Residence on May 22, 2024. They were arrested for a violation of California Health and Safety Code § 11352 (selling, furnishing, administering, giving away or transporting controlled substances).

19. Upon arrest, law enforcement seized SUBJECT DEVICE 1 from MCKENZIE and SUBJECT DEVICE 2 from EL-EMMARA. MCKENZIE and EL-EMMARA were transported to the Alhambra Police Station for booking and processing. The SUBJECT DEVICES are currently stored as evidence at the Alhambra Police Station.

20. At the Alhambra Police Station officers determined the suspected methamphetamine weighs approximately 235 lbs. Methamphetamine is a Schedule II controlled substance.

21. Also at the Alhambra Police Station, I read EL-EMMARA his <u>Miranda</u> Warnings from a DEA-13 form. EL-EMMARA waived his rights and provided statements.[2] EL-EMMARA claimed that he

---

[2] MCKENZIE was read his <u>Miranda</u> rights and invoked his right to counsel.

received instructions from certain individuals based in the United Kingdom via text messages and cell phone calls. Originally, EL-EMMARA said he was only scheduled to stay in the United States until shortly after his birthday on May 14, 2024. However, EL-EMMARA explained that the individuals from the United Kingdom promised to pay for his trip and provide an additional £10,000 to £15,000 (British pound sterling, not dollars) if he performed certain errands. EL-EMMARA added that moving the boxes was part of the errands, that MCKENZIE met him in California to help move the boxes, and that MCKENZIE had helped him move the boxes. EL-EMMARA said that he believes the boxes are supposed to be delivered to MCKENZIE's contact in New York. EL-EMMARA believed the phone number for MCKENZIE's New York contact was stored in MCKENZIE's cell phone. When asked if he knew what was inside the boxes, EL-EMMARA said marijuana, cocaine or an illegal drug.

22. MCKENZIE is a citizen of the United Kingdom. El-EMMARA is a citizen of Sweden.

### V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

23. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both

8

domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

      b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

      c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

24. As used herein, the term "digital device" includes the SUBJECT DEVICES.

25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a.  Forensic methods may uncover electronic files, or remnants of such files, months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

26. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

       a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.  Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

27. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

28. For all of the reasons described above, there is probable cause to believe that MCKENZIE and EL-EMMARA have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. In addition, for all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 26th day of May,
2024.

_____
THE HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE